IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| Sandra J. Hiddleson, Personal Representative of the Estate of Rochelle Renee Brown, deceased,<br><br>Plaintiff,<br><br>v.<br><br>Michael J. Astrue, Commissioner of Social Security Administration,<br><br>Defendant. | Civil Action No. 9:11-1440-SB<br><br>**ORDER** |



Rochelle Renee Brown ("Brown") filed this action on June 13, 2011, pursuant to section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying her claim for disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits. Brown passed away on December 21, 2011, and on March 28, 2012, Sandra J. Hiddleson ("Hiddleson") was appointed personal representative for Brown's estate. By order filed September 11, 2012, the Court substituted Hiddleson as the Plaintiff in this matter.

The record includes the report and recommendation ("R&R") of United States Magistrate Judge Bristow Marchant, which was made in accordance with 28 U.S.C. § 636(b)(1)B) and Local Civil Rule 73.02(B)(2)(a), D.S.C. In the R&R, the Magistrate Judge recommends that the Court affirm the Commissioner's final decision denying the Plaintiff's claims. The Plaintiff filed timely objections to the R&R; the Defendant filed a response to the Plaintiff's objections; and the matter is ripe for review. See 28 U.S.C. § 636(b)(1)

(providing that a party may object, in writing, to a Magistrate Judge's R&R within fourteen days after being served with a copy).

## BACKGROUND

### I. Procedural History

Brown filed her claims for DIB and SSI on July 1, 2008, alleging a child disability onset date of June 30, 1988, and an SSI onset date of July 15, 2008. The Commissioner denied Brown's claims initially and upon reconsideration. Brown then timely requested a hearing, which was held on February 9, 2010, before Administrative Law Judge ("ALJ") Linda R. Haack. On April 23, 2010, the ALJ issued a decision denying Brown's claims, finding as follows:

> 1. The claimant has not met the insured status requirement of the Social Security Act.
>
> 2. Born on July 25, 1966, the claimant had not attained age 22 as of June 30, 1988, the alleged onset date (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).
>
> 3. The claimant has not engaged in substantial gainful activity since June 30, 1988, the alleged onset date (20 CFR 404.1571, *et seq.*, and 416.971, *et seq.*).
>
> 4. The claimant has the following severe impairments: borderline intellectual functioning, knee pain, degenerative disc disease with back pain, obesity, and dyspnea upon exertion secondary to anxiety or air hunger (20 CFR 404.1520(c) and 416.920(c)).
>
> 5. The claimant does not have an impairment or condition of impairments that meets or medically equals the criteria of one of the listed impairments of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a significant range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).



2

Specifically, the claimant is able to read and write simple words; add and subtract simple numbers; sit for 6 hours in an 8-hour workday with normal breaks; stand and walk for a total of 2 hours for a few minutes at a time; lift 20 pounds occasionally and 10 pounds frequently; climb stairs and ramps rarely for up to 5% of the day; cannot climb ropes, ladders, or scaffolds; can rarely crawl, kneel, crouch, or squat; can occasionally stoop or balance; can push and pull up to 20 pounds occasionally and 10 pounds frequently with her upper extremities; can occasionally operate foot controls; must avoid hazards; and is limited to simple routine tasks.

7. At all times relevant to this decision, as a result of her residual functional capacity as described above, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. The claimant was born on July 25, 1966, and was 21 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. She is currently 43 years old (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 1988, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. at 13-22.)

Brown filed a timely request for a review of the decision, which the Appeals Council denied, thereby making the ALJ's decision the final decision of the Commissioner.

## II. Medical Evidence

Brown was born on July 25, 1966, and she was 21-years-old on the alleged onset date of child disability and 43-years-old at the time of the ALJ's decision. On December

3

2, 1976, when Brown was in the fifth grade, the Charleston County School District psychologically evaluated her and placed her in a special education program. In 1979, Brown scored an IQ of 68 on a Stanford Binet test.

In 1983, school psychologist Dr. Greg Sikora performed a psychological evaluation of Brown, which revealed a verbal IQ score of 65, a performance IQ score of 72, and a full-scale IQ score of 67. Dr. Sikora concluded that Brown's attention span and ability to maintain concentration appeared good relative to her age and ability level, and he opined that she was functioning within the mildly retarded range of intellectual ability for her age.

Brown's medical records next resume in 2007, approximately 24 years later, when Brown was seen at MUSC Health for various complaints, including chest pain, left arm and leg weakness, left groin pain, cellulitis, dyspnea, a urinary tract infection, high blood sugar, and sleep problems. The records also generally indicate that Brown was morbidly obese; that she had diabetes (well-controlled on medication); that there was no evidence of acute cardiopulmonary disease with no objective cause for her symptoms of dyspnea being found; and that she had degenerative changes of the lumbar spine. There is no evidence of any psychiatric of cognitive evaluation of Brown until a consultative examination performed on October 28, 2008.

On May 20, 2008, approximately two months before her alleged SSI onset date, Brown visited MUSC Health complaining of intense pain in her leg, groin, and lower back; she claimed that her leg had gone "limp" approximately six days before and that she was unable to move it. Brown was in a wheelchair during this visit and stated that she had been unable to perform her job as a school crossing guard and wanted something for the pain with a referral to "get this problem fixed so she can get back to work and back to

enjoying her child." (Tr. at 275.) On examination, Brown had a regular heart rate and rhythm with no murmur, rub, or gallop; her lungs were clear; she had no edema, cyanosis, or clubbing in her extremities; and her muscle strength was 5/5 (full) except with respect to her left lower extremity, whih was 3/5 (1/5 in the hamstring). Brown was referred for an MRI and was prescribed pain medication and a shower chair for use in the shower.

The following day, an MRI was performed, which showed that Brown's lumbar spine was normally aligned, with vertebral bodies being normal in height and signal intensity. The MRI also revealed an increase in degeneration of the L2/3 disc with loss of height and T2 signal since a previous MRI. Brown received epidural steroid injections for pain management.

On September 30, 2008, Brown visited the emergency room with complaints of acute chest pain and dyspnea, but no significant findings were noted.

On October 10, 2008, Brown met with Dr. Leslie Pelzer for a comprehensive orthopedic examination. Dr. Pelzer reviewed Brown's medical history and summarized her medical records. On examination, Brown's lungs appeared clear, and Brown had a regular heart rate and rhythm without murmur or gallop. Brown's back was non-tender to palpation, and her cervical spine appeared within normal limits. Brown exhibited lumbar spine flexion to 80 degrees, extension to 20 degrees, and lateral flexion to 15 degrees. Brown's shoulder examination was equal on the left and right with abduction of 130 degrees, adduction of 20 degrees, forward elevation of 110 degrees, internal rotation of 50 degrees, and external rotation of 50 degrees. Dr. Pelzer noted that some of Brown's limitations were related to her size, and Dr. Pelzer noted that Brown's elbows and wrists were within normal limits, but that her knee flexion was limited due to her size. Dr. Pelzer

examined Brown's hip, ankle, and straight leg raise, noting limitations, and Dr. Pelzer examined Brown's hands, finding them within normal limits with no joint deformity, swelling, or decreased range of motion, and noting a grip strength of 5/5 (full). Dr. Pelzer noted that Brown had good fine and gross manipulation bilaterally; that her heel-to-toe walk was hesitant and slow; that she was only able to squat partially; that her gait was antalgic; that her strength in her lower left extremity was 4/5 but intact; that Brown had no joint abnormalities; that her reflexes were 1 + throughout; and that there was no atrophy. Dr. Pelzer also noted that although Brown claimed to use a cane for ambulation, she did not bring a cane to the appointment. Ultimately, Dr. Pelzer assessed Brown with lumbar disc disease with radiculopathy, which caused chronic pain; diabetes mellitus; obesity; hypertension; depression and anxiety; and congestive heart failure.[1]

On October 20, 2008, Dr. Sherry Reider performed a mental evaluation of Brown. Brown advised Dr. Reider that she was applying for disability benefits because her back was "messed up." Dr. Reider observed Brown to have a normal, full range affect, and Dr. Reider observed no pain behaviors during the 75-minute evaluation. Brown described her overall mood as "okay" but stated that she frequently felt nervous. Brown described feeling scared and anxious up to 15 times a day, but not of an intensity characteristic of full panic attacks. Brown stated that she slept well (with sleeping medication) and that she had a baseline appetite and energy level. Brown stated that her daily activities included getting her daughter ready for school and getting herself ready to work as a school crossing guard; performing a number of housekeeping tasks like washing clothes, dishes, and cleaning;

---

[1] As the Defendant notes, Dr. Pelzer's report does not reference any testing procedures explaining the diagnoses of depression, anxiety, or congestive heart failure.

6

cooking and preparing meals; and shopping for groceries. Brown indicated that she maintained a checking account with her sister's help, and she reported that she had taken care of her physically disabled mother for 30 years prior to her mother's death in 2000.

Dr. Reider found Brown to have a verbal IQ score of 69, a performance IQ score of 70, and a full-scale IQ score of 67. Dr. Reider diagnosed Brown with generalized anxiety disorder, borderline intellectual functioning, chronic back pain (by report), DM, and HTN, with a Global Assessment of Functioning ("GAF") of 65, which indicates the presence of only mild symptoms of depression or difficulty in social or occupational settings. Dr. Reider determined that although Brown's test scores placed her on the borderline of two categories, based on her daily functioning abilities, a diagnosis of borderline intellectual functioning appeared more appropriate than a diagnosis of mild mental retardation. Dr. Reider further stated that Brown had the mental capacity for at least simple work, such as the crossing guard work she was performing, and also that Brown had adequate basic math skills and experience with money to manage the income she received.

On November 3, 2008, state agency physician Dr. Katrina Doig reviewed Brown's medical records and opined that she had the residual functional capacity ("RFC") for light work with the ability to stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, to sit (with normal breaks) for a total of about six hours in an eight-hour workday, with a limited ability to push and/or pull in her lower extremities due to her physical condition. Dr. Doig also opined that Brown could frequently balance, stoop, and kneel; that she could occasionally climb ramps/stairs, crouch, and crawl; but that she could never climb ladders, ropes, or scaffolds. Dr. Doig did not note any other limitations other than a need for Brown to avoid concentrated exposure to hazards such as machinery

and heights.

Stage agency psychologist Dr. Michael Neboschick reviewed Brown's medical records on November 5, 2008, and opined that Brown's mental impairment did not meet the criteria for any listing and resulted in only mild limitations in Brown's activities of daily living and in maintaining social functioning, with moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Dr. Neboschick filled out a mental RFC assessment where he opined that Brown was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods, but that she otherwise had no significant limitations. Dr. Neboschick noted that Brown was capable of performing simple tasks for at least two-hour periods and that she was capable of single, repetitive tasks without special supervision. He also stated that Brown could work regularly and accept supervisory feedback.

Brown continued to be followed at MUSC Health, where she received generally conservative treatment for her complaints, including steroid injections for her back pain.

On March 9, 2009, state agency physician Dr. William Cain reviewed Brown's medical records and reached the same conclusions with regard to Brown's RFC as Dr. Doig reached, except that Dr. Cain found that Brown could only occasionally kneel and crouch and that she should avoid all exposure to hazards such as machinery and heights.

Brown visited MUSC on February 20, 2009, complaining of sinus problems, and on March 6, 2009, complaining of headache and high sugars. On April 9, 2009, she reported to the emergency room for chest pain. On June 2, 2009, Dr. Ian Johnson with MUSC recommended that Brown lose weight to help with her back pain. On July 10, 2009, Brown

again visited MUSC with complaints of chest pain and shortness of breath. On examination, Brown had a normal EKG; her lungs were clear; no heart problems were noted; and she exhibited no deformities, cyanosis, or edema in her extremities. The treating physician noted that a large component of Brown's complaints could be air hunger and anxiety and possible panic attacks and again stressed the importance of losing weight.

Brown was seen on October 22, 2009, complaining of left knee pain, and on November 2, 2009, complaining of continued left knee pain. The November 2 examination revealed a slightly swollen left knee, tender along the medial joint line, with no joint instability. Although Brown complained of pain with active and passive movement, she stated that she took her dog for a daily walk. Brown saw no physicians between November 2009 and April 2010, the date of the ALJ's decision.

### III. Brown's Testimony

At the hearing on February 9, 2010, Brown testified that she graduated from high school; that she could read some of the newspaper and children's books; that she could write simple notes; and that she could add and subtract simple numbers. Brown also testified that she had worked the morning of the hearing as a school crossing guard; that she worked approximately an hour-and-a-half each day, five days a week; and that she had been working as a guard from 2003 to 2009. Brown stated that she had worked for MTC housekeeping from 1997 to 2000, but that she had stopped working as a housekeeper to care for her mother.

When asked why she believed she was disabled, Brown discussed her back pain and her belief that her condition resulted from lifting her mother. She reported that her back felt "like it's broken in half" when she walked and that taking pain medication helped

her condition, but that it only allowed her to "function somewhat."

When asked about her condition as it existed in 1988, Brown estimated that she could lift approximately 40 pounds; that she could sit for maybe up to two hours; that she could stand for up to six hours and could walk four or five blocks; and that she could follow instructions as long as she understood them. When asked about her condition as of 2008, Brown estimated that she could lift no more than five pounds; that she could sit for maybe 20 minutes; that she could stand for only five minutes; that she could only walk around the corner; and that she could follow instructions. She testified that she was seeing a doctor on a regular basis because she was having trouble with her knee, had pain in her back, and had trouble remembering things. She also reported that she had lost 27 pounds.

On examination by her attorney, Brown testified that she brought a chair to work so she could sit, and she discussed the problems caused by her weight, such as bed sores and trouble with walking or lifting. She stated that she did not think she had any medical problems until her mother died, but that she had experienced depression when she was a teenager.

### IV.  Vocational Testimony

Vocational expert Mary Cornelius testified that Brown's past work as a school crossing guard involved light, unskilled work, and that Brown's past work as a housekeeper involved heavy, unskilled work. The ALJ asked Cornelius to consider a hypothetical person of Brown's age and education level, who could read, write simple words, add and subtract simple numbers, with the following limitations: could sit for eight hours in an eight-hour workday with normal breaks; could stand and walk for a total of two hours, a few minutes at a time; could lift 20 pounds occasionally (one-third of the workday), and 10 pounds

frequently (two-thirds of the work day); could not climb ropes, ladders, or scaffolds; could crawl, kneel, crouch, and climb stairs and ramps rarely (5% of the day); could stoop or balance occasionally; could push or pull within pound limitations of upper extremities; could operate foot controls occasionally; must avoid hazards; and must be limited to simple, routine tasks.  Cornelius testified that such an individual could perform the essentially sedentary jobs of garment folder or mail sorter and the sedentary jobs of breaker semi-conductor, information clerk, or jury preparer.  Upon questioning by Brown's attorney, however, Cornelius testified that Brown would not be employable if the following limitations were added to the hypothetical: memory impairments, pain, psychiatric-based symptoms, and the inability to focus, concentrate, or stay on task resulting in the individual being unable to attend up to 20% of the workday.

## STANDARD OF REVIEW

### I.     The Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to the Court.  The recommendation has no presumptive weight, and the responsibility for making a final determinate remains with the court.  <u>Matthews v. Weber</u>, 423 U.S. 261, 269 (1976).  The court reviews de novo those portions of the R&R to which a specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions.  <u>See</u> 28 U.S.C. § 636(b)(1).  In the absence of an objection, the Court reviews the R&R only for clear error.  <u>See</u> <u>Diamond v. Colonial Life & Accident Ins. Co.</u>, 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of a timely filed objection, a district court need not

11

conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation") (citation omitted).

## II.     Judicial Review of Final Decision

The role of the federal judiciary in the administrative scheme as established by the Social Security Act is a limited one.  Section 205(g) of the Act provides that, "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).  "Consequently, judicial review . . . of a final decision regarding disability benefits is limited to determine whether the findings are supported by substantial evidence and whether the correct law was applied." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).  "Substantial evidence" is defined as: evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). In assessing whether there is substantial evidence, the reviewing court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency.  Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original).

## DISCUSSION

### I.     The Commissioner's Final Decision

The Commissioner is charged with determining the existence of a disability.  The

12

Social Security Act, 42 U.S.C. §§ 301-1399, defines "disability" as the "inability to engage in an substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423 (d)(1)(A). This determination involves the following five step inquiry:

> [The first step is] whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R.§ 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. If so the claimant is disabled, if not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work.

Mastro, 270 F.3d at 177 (citing 20 C.F.R. § 416.920).

If the claimant fails to establish any of the first four steps, review does not proceed to the next step. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993). The burden of the production and proof remains with the claimant through the fourth step. However, if the claimant successfully reaches step five, then the burden shifts to the Commissioner to provide evidence of a significant number of jobs in the national economy that the claimant could perform, considering the claimant's medical condition, functional limitations, age, education, and work experience. Walls, 296 F.3d at 290.

As previously set forth, the ALJ determined that Brown had not engaged in substantial gainful activity since the alleged onset date of disability. At the second step, the ALJ found that Brown had the following "severe" impairments: borderline intellectual

functioning, knee pain, degenerative disc disease with back pain, obesity, and dyspnea upon exertion secondary to anxiety or air hunger. Third, the ALJ found that these medically determinable impairments did not meet or medically equal the criteria of one of the criteria listed in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. The ALJ then determined that Brown retained the RFC to perform a significant range of light work limited to: reading and writing simple words; adding and subtracting simple numbers; sitting for six hours in an eight-hour workday with normal breaks; standing and walking for a total of two hours for a few minutes at a time; lifting 20 pounds occasionally and 10 pounds frequently; climbing stairs and ramps rarely for up to 5% of the day; never climbing ropes, ladders, or scaffolds; rarely crawling, kneeling, crouching, or squatting; occasionally stooping or balancing; pushing and pulling up to 20 pounds occasionally and 10 pounds frequently with upper extremities; occasionally operating foot controls; avoiding hazards; and being limited to simple routine tasks. After finding that Brown could not perform her past relevant work, the ALJ found that Brown could perform other jobs that exist in significant numbers in the national economy. Therefore, the ALJ found that Brown was not disabled.

## II. The Magistrate Judge's Analysis and the Plaintiff's Objections to the R&R

In her complaint, Brown argues: (1) that the ALJ erroneously concluded that her mental condition did not meet or equal Listing 12.05; (2) that the ALJ failed to consider the combined effect of her multiple severe impairments; and (3) that the ALJ performed an improper credibility analysis.

After reviewing the relevant evidence and considering the parties' arguments, the Magistrate Judge issued an R&R finding (1) that substantial evidence supports the ALJ's

conclusion that Brown's medical condition did not meet or equal Listing 12.05 because Brown's intellectual functioning did not cause significant limitations in her adaptive functioning; (2) that the ALJ thoroughly reviewed the medical evidence and adequately considered and explained her consideration of Brown's impairments in combination; and (3) that the ALJ conducted a proper credibility analysis.

In her objections to the R&R, the Plaintiff first argues that the Magistrate Judge erred in his factual assessment when he stated that Brown "has a high school education with past relevant work experience as a school crossing guard and housekeeper." (R&R at 3.) Essentially, the Plaintiff argues that Brown did not graduate from high school but instead received a certificate of completion, and that Brown had no past relevant work.

A review of the record indicates that this objection is without merit. First, at the hearing before the ALJ, Brown testified that she went through the twelfth grade and that she graduated. (Tr. at 34-35.) In addition, Brown told the state agency physician that she completed the twelfth grade. (Tr. at 172.) With respect to her work history, Brown testified that she was working as a crossing guard and that she previously had worked as a housekeeper. (Tr. at 37-39.) Thus, the Court finds that the record evidence supports the ALJ's and the Magistrate Judge's factual assessment. Moreover, the Court notes that neither of these issues affect the outcome of this case, and the Plaintiff has not established any prejudice stemming from them.

As a second objection, the Plaintiff claims that the Magistrate Judge erred in upholding the ALJ's finding that Brown failed to show deficits in adaptive functioning prior to the age of 22. Essentially, the Plaintiff contends that the ALJ erred by concluding that Brown's impairments or combination of impairments did not establish a disabling mental

15

impairment pursuant to Listing 12.05 of Appendix 1 to 20 C.F.R. § 404, Subpart P., and, in turn, that the Magistrate Judge erred by finding that substantial evidence supports the ALJ's conclusion.

The introductory paragraph of Listing 12.05 states that "[m]ental retardation refers to significantly subaverage general intellectual functioning **with deficits in adaptive functioning initially manifested during the developmental period**; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.05 (emphasis added). "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Jackson v. Astrue, 467 F. App'x 214, 217-18 (4th Cir. Feb. 23, 2012) (unpublished) (citing Atkins v. Virginia, 536 U.S. 304, 309 n. 3 (2002)). Listing 12.05 also requires satisfaction of one of four additional requirements, identified as Requirements A, B, C, or D. At issue in this case is Requirement C, which requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id.

In her decision, the ALJ stated:



> Finally, with regard to the claimant's intelligence testing and history of test results in the mildly mentally retarded range, following a thorough review of the evidence of record, the undersigned finds that a diagnosis of borderline intellectual functioning is more appropriate for the claimant given her lack of adaptive deficits and functional abilities. Thus, as the claimant suffers from borderline intellectual functioning, she does not meet the requirements as set out in Listing 12.05.
>
> Although Stanford Binet testing has been performed, and indicated mild mental retardation, this testing is not performed using a 100-point scale and

cannot be used to establish mental retardation under Listing 12.05. See Exhibit 1F. The claimant was also tested at age 16, using the WISC, and again earned scores in the mild mental retardation range. However, testing records indicate that the claimant put forth limited effort and Vineland social testing revealed social skills and adaptive behavior skills in relatively well developed (low average) range. Although a former teacher also reported that the claimant needed a high degree of structure, the claimant was able to work well in small groups, gained knowledge, and attained functional literacy. By October 2009, the claimant put full effort into testing. She reported that she could use a checking account, with help balancing it, paid her bills in cash, cooked (sometimes from scratch), shopped, cared for her child, and worked as a school crossing guard (which requires knowing rules, taking care of children, and accepting responsibility for her actions). The claimant also reports that she had taken care of her physically disabled mother for 30 years, again demonstrating her responsibility and her capacity for performing multiple tasks. See Exhibit 6F. Thus, while testing results indicate mild mental retardation to low average scores, following a thorough review of the evidence of record, the undersigned had determined that a diagnosis of borderline intellectual functioning is more appropriate for the claimant. Moreover, as a result of this condition, the claimant has mild limitations in her activities of daily living, mild limitations in her social functioning, moderate deficiencies in concentration, persistence, and pace, and no episodes of decompensation. . . .

(Tr. at 15.)

In this case, and more specifically in her objections, the Plaintiff argues that "the ALJ (and subsequently the Magistrate) overlooked the Listing in favor of an ad hoc analysis which the ALJ was surely unqualified to undertake." (Entry 24 at 3.) The Plaintiff asserts that the ALJ and the Magistrate Judge ignored relevant evidence, and she claims that Brown established that she met Listing 12.05.

After a thorough review of the ALJ's decision, the Court finds no reversible error. First, as previously set forth, under the substantial evidence standard, the Court does not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency. Mastro, 270 F.3d at 176. Second, the law is clear that to meet Listing 12.05, a claimant must demonstrate deficits in adaptive functioning

17

initially manifested during the developmental period. See Hancock v. Astrue, 667 F.3d 470, 473 (4th Cir. 2012) (identifying this requirement as "prong one" of the Listing 12.05 analysis).

Here, the ALJ referenced Brown's IQ scores and found that she had additional and significant work-related limitation of function. Nevertheless, the ALJ determined that a diagnosis of borderline intellectual functioning, itself a severe impairment, was more appropriate than a diagnosis of mild mental retardation given Brown's functional abilities. See id. at 474 (stating that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record"). The ALJ stated in her decision that she gave significant weight to Dr. Reider's opinion; after examining Brown, Dr. Reider opined that a diagnosis of borderline intellectual functioning was more appropriate than a diagnosis of mild mental retardation given Brown's functional abilities. More importantly perhaps, as set forth above, the ALJ discussed the evidence she relied on in determining that Brown failed to establish the required deficits in adaptive functioning. For example, the ALJ noted that Brown had social skills and adaptive behavior skills in a relatively well developed (low average) range; that Brown worked well in small groups, gained knowledge, and attained functional literacy; and that Brown used a  checking account, with help balancing it, paid her bills in cash, cooked (sometimes from scratch), shopped, cared for her child, and worked as a school crossing guard. The ALJ also noted that Brown cared for her elderly mother for years, and that Brown had testified about her ability to go shopping, do housework without lifting, watch television, play games, attend church and her daughter's school events, walk for exercise, and perform housekeeping.

The Court has independently reviewed the record and the evidence considered by the ALJ, and, after review, the Court concludes that substantial evidence supports the ALJ's determination that the Plaintiff failed to demonstrate deficits in adaptive functioning initially manifested during the developmental period. See, e.g., Hancock, 667 F.3d at 476 (finding sufficient evidence to support the ALJ's conclusion that Hancock had no deficits in adaptive functioning where the evidence indicated that Hancock had previously worked as a battery assembler and a drop clipper; that Hancock had the ability to shop, pay bills, and make change; that she took care of three small grandchildren; that she did the majority of the household's chores, including cooking and baking; that she was attending school to obtain a GED; and that she did puzzles for entertainment). Thus, the Court likewise finds that substantial evidence supports the ALJ's determination that the Plaintiff failed to meet listing 12.05, and this objection is overruled.

Third, the Plaintiff objects to the Magistrate Judge's "finding that a 'plain reading' of the ALJ's decision allows for the inference that she evaluated the combined effect of Ms. Brown's multiple impairments." (Entry 24 at 4.) In support of her argument, the Plaintiff refers to Martin v. Astrue, where a court in this district stated that "under established Fourth Circuit law, the ALJ is required to specifically address the impairments as a whole, i.e., collectively." No. 1:10-2984-JFA-SVH, 2011 WL 6115032, *1 (D.S.C. Dec. 7, 2011) (citing Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

After a thorough review of the ALJ's decision, the Court agrees with the Magistrate Judge that the ALJ properly considered and discussed Brown's impairments–not just Brown's severe impairments but also her non-severe impairments–and considered their collective impact on her ability to perform work. As the Magistrate Judge stated, "a plain

reading of the decision reflects the thorough review and consideration given by the ALJ to the evidence and the effects of all of the Plaintiff's impairments in deciding her RFC, and no reversible error is shown in this analysis." (Entry 23 at 17.) Importantly, the Court also notes that the Plaintiff has not pointed to any symptoms the ALJ failed to consider, or how the outcome of the ALJ's decision would have been different had the ALJ included any additional discussion of the combined effects of Brown's multiple impairments. This objection is overruled.

The Plaintiff does not object to the Magistrate Judge's determination that the ALJ performed a proper credibility analysis, and the Court finds no clear error in the ALJ's analysis.

Finally, the Plaintiff asks the Court to remand her case for an award of benefits; however, because the Court finds that substantial evidence supports the ALJ's decision, the Court finds that remand is unnecessary.

## CONCLUSION

Based on the foregoing, it is hereby

**ORDERED** that the Magistrate Judge's R&R (Entry 23) is adopted; the Plaintiff's objections (Entry 24) are overruled; and the Commissioner's final decision denying benefits is affirmed.

**AND IT IS SO ORDERED.**

Sol Blatt, Jr.
Senior United States District Judge

March 29, 2013
Charleston, South Carolina

20